St. Louis & San Francisco Railroad Company *v.* McFall.

Opinion delivered April 8, 1905.

Railroad—liability for negligence of employee—imputed negligence.— The negligence of a locomotive engineer whereby a conductor was killed is not imputable to the conductor unless the engineer was at the time subject to the control of the conductor, and the negligence was committed at a time when it was within the power of such conductor to prevent it, and it was his duty to do so, or under circumstances which indicated that he assented to or acquiesced in the negligent act by his failure to interfere, or unless he directed it to be done.

Appeal from Craighead Circuit Court, Jonesboro District.

Felix G. Taylor, Judge.

Affirmed.

STATEMENT BY THE COURT.

On the 16th day of February, 1902, and for some time prior thereto, W. O. McFall was employed by the St. Louis & San Francisco Railroad Company as a conductor, and on that day had charge of fast freight train 25,201, with William Adams as his engineer, and was running from Thayer, Mo., to Memphis.

Tenn. This train left Thayer, Mo., between 4 and 5 a. m. as second section of 201, with orders to run forty-five minutes behind first 201, which was a regular passenger train. At Hardy, the first water station, some eighteen miles east of Thayer, McFall's train stopped, and there received orders to meet freight train 252, in charge of Conductor Shirk and Engineer Morehead, at Ravenden Station, about fifteen miles further east. McFall's train was a first-class train, and was entitled to the main line at the meeting point, while Shirk's train was a third-class train, and was required to take the siding at this meeting point.

Shirk's train arrived at Ravenden, the meeting point, from five to ten minutes ahead of McFall's train, and, instead of taking the siding, stopped on the main line at the switch for this siding. The engineer cut the engine off, and ran it up to the water tank on the main line, took water, and returned to his train. McFall's train approached from the west, without stopping at the station, and ran into Shirk's train. No one was hurt on either train except Conductor McFall, who at the time of the collision was looking out at the side door of his caboose. The sudden stopping of the train caused the side door, which was a sliding door, to close, striking McFall about the head or neck, killing him.

It also appears that neither train had any rights over the other *at the point of collision.* McFall's train, as against Shirk's train, had the superior right to the main line up to the clearance post, a few feet west of the east switches at this station. Shirk's train had superior rights to the sidetracks, and had the right to the main line east of the switch. The territory between the east switch stands and the clearance posts is called neutral territory, and this is where Shirk's engine was when McFall's engine struck it.

Anna McFall, as administrator of W. O. McFall, deceased, brought this action against the railroad company to recover damages caused by the death of her intestate for the benefit of the widow and children of the deceased, alleging that she was his widow, and Leoho McFall, fourteen years of age, Gladdis McFall, thirteen years of age, and Nadine McFall, eight years

of age, were his children. She alleged in her complaint that McFall's death was caused by the negligence of his own engineer, Adams, in that the latter approached Ravenden Station, the meeting point, without reducing the speed of his train, and without having his train under control, and by the negligence of Shirk and his engineer in not having their train on the siding on the arrival of McFall's train.

The defendant answered, and admitted that McFall's engineer, Adams, was negligent, and alleged that the combined negligence of Adams and the contributory negligence of McFall caused the collision and McFall's death.

There is no contention here that McFall and the engineer on his train and the employees on Shirk's train were fellow servants, and that he had assumed the risk of their negligence. It is virtually conceded that they were not. The only questions presented for our consideration on this appeal are: (1) Is the negligence of the engineer, Adams, to be imputed to McFall? and (2), if not, was McFall guilty of negligence which contributed to his death?

The facts which we have stated were proved in the trial of the issues in this case; also the following rules:

"Rule 352. Engineers, when on the road, are under the direction of the train conductor, whose orders they will obey, unless his orders may endanger the safety of the train or require a violation of the rules, in which event the engineer becomes equally responsible with the conductor."

"505. No train will leave a station without sufficient brakes, air or hand, to handle it with safety to the next stopping point."

"508. Enginemen and conductors will both be held responsible for the test being made as provided in rule 502," which provides how the air brakes shall be tested.

Evidence was adduced tending to prove the following facts: When McFall's train was about to leave Thayer, Mo., as before stated, Adams, his engineer, undertook to test the air brakes, when McFall said to him, "Let's not wait for you to pump up the air; let's go on, and you can try the air down the road, the

first time we have to stop," and they moved on without making the test of the air brakes.  At Hardy, a station eighteen miles from Thayer, they stopped to receive orders, and in doing so applied the air, and the air brakes worked well.  They received orders to meet train No. 252, Shirk's train, at Ravenden, about fifteen miles distant and then ran on to that place.  Adams, relating what then followed, says:  "There was a slow bridge about two and a half miles west of Ravenden, and I think we had an order there to reduce speed at that bridge, and in coming there it was awfully cold, and I had been using the engine pretty hard, and it was not steaming good, and I shut off way the other side of the bridge, and let the train roll over the bridge, and did not use the air, and after we rolled over the bridge I put the steam on again, and kept it on until we got to the mile board at Ravenden.  I whistled for the road crossing there, and for the mile board, and rolled on down, and then whistled for the meeting order, one long and one short blast, and we came on down, and there is a reverse curve there, and when I got in the curve I looked over about the tank, and saw smoke and steam arising, and I said to my fireman: 'Those fellows are here, and we won't be delayed any,' and we rolled on down, and about fifty yards north of the pump house I applied the air, and I felt the train budge like it was working all right, and I rolled on down there expecting 252 to be on the sidetrack, and when we got down a little farther I looked on the passing track, and did not see anything of them.  Well, I was pulling Mr. McFall, and Shirk's train was No. 252, and I expected to see Shirk's train on the siding, but I did not see them, and I thought probably they were doubling over another track, and by that time I was getting up near the tank, and I watched for them, and did not see them, and I put the air on, and then looked at the order board, and saw it was all right, and just as I passed the order board I came around the depot, and struck straight track, and I saw their engine right ahead of me, and it looked to me like they were about 150 yards ahead of me, or not so far, and that scared me, and I put on the air, and reversed the engine, and that did not seem to do any good at all, and we run on down and struck them."  He further testified that his train was running about twenty-five miles an hour as it passed

the mile board, "and had been for a mile back;" and about eight or ten miles an hour when it struck Shirk's train; and thinks that he could have stopped his train and avoided the collision if the air which set the brakes had "worked all right." It "worked all right" at Hardy, and until he "got in sight" of Shirk's train, and then failed, and the collision followed.

As his train approached Ravenden, McFall was in the caboose with no end doors and platform and no cupola; and it had side doors on rollers. Adams testified: "McFall being in the caboose, there was nothing he could have done in the way of signalling me after it became apparent that something was wrong. I could not have seen him from the mile board. The track is all curves, first one way, then the other. In the curve at Ravenden, with the short train we had, I do not think McFall could have seen the engine, because the water tank and depot were in the way. He could have set the brakes by turning the air-cock, for the purpose of checking the train, but that I was doing, and could do more effectually than McFall could have done."

At the time of the collision McFall was looking out of the side door of his caboose, when the sudden stopping of the train, caused by the collision, caused the door to close with great force and kill him, striking him on the head.

The jury returned a verdict in favor of the plaintiff for $6,000; judgment was rendered in her favor for that amount; and the defendant appealed.

*L. F. Parker* and *W. J. Orr,* for appellant.

The negligence of the engineer is imputed to the conductor. 39 S. W. 593; 53 Mo. App. 276; 62 Mo. 49; 45 Ark. 318; 62 Ark., 109; 116 U. S. 366; 23 S. W. 725; 82 S. W. 245; 27 Hun, 85; 47 N. J. L. 161. Appellee's intestate was guilty of negligence. 33 S. W. 1070; 80 Ga. 427; 25 C. C. A. 585; 118 Fed. 230; 88 N. W. 974; 95 N. W. 322; 11 S. W. 701; 75 S. W. 691.

*J. F. Gautney* and *N. F. Lamb,* for appellee.

Battle, J. Assuming that the collision was caused by the negligence of Adams, the engineer, was such negligence imputable to McFall? In *Little* v. *Hackett,* 116 U. S. 366, Mr. Justice Field, delivering the opinion of the court, said: "That one cannot recover damages for an injury to the commission of which he has directly contributed is a rule of established law, and a principle of common justice. And it matters not whether contribution consists in his participation in the direct cause of the injury, or in his *omission of duties* which, if performed, would have prevented it." In that case the court held "a person who hires a public hack, and gives the driver directions as to the places to which he wishes to be conveyed, but exercises no other control over the conduct of the driver, is not responsible for his acts or negligence, nor prevented from recovering against a railroad company for injuries suffered from a collision of its train with the hack, caused by the negligence of both the managers of the train and of the driver." The court, after a review of many cases upon the subject, said: "Those on a hack do not become responsible for the negligence of the driver, if they exercise no control over him further than to indicate the route they wish to travel or the places to which they wish to go. If he is their agent, so that his negligence can be imputed to them to prevent their recovery against a third party, he must be their agent in all other respects, so far as the management of the carriage is concerned; and responsibility to third parties would attach to them for injuries caused by his negligence in the course of his employment. But, as we have already stated, responsibility cannot, within any recognized rules of law, be fastened upon one who has *in no way interfered with and controlled* in the matter causing the injury. From the simple fact of hiring the carriage or riding in it no such liability can arise. The party hiring or riding must in some way have co-operated in producing the injury complained of before he incurs any liability for it."

In *New York, Lake Erie & Western Railroad Company* v. *Steinbrenner,* 47 N. J. L. 161, s. c. 23 Am. & Eng. Railroad Cases, 330, a leading case, in which there is a long review of authorities, the following rule is laid down: "A passenger in

a hired coach may, by words or conduct at the time, so sanction or encourage a special act of rash or careless driving as to commit an act of negligence as will debar him from a suit against a third person for an injury resulting from the co-operating negligence of both parties. But for whatever purpose the negligence in invoked—whether as a cause of action for an injury done by the driver, or as contributory negligence to bar an action by the passenger against a third person for an injury sustained—the negligence, to be imputed to the passenger, must be such as arises in some manner from his own conduct. The negligence of the driver, without some co-operating negligence on his part, cannot be imputed to the passenger in virtue of the simple act of hiring."

Mr. Beach, in work on Contributory Negligence, § 100, says: "The general rule is that when the plaintiff's own want of ordinary care is a proximate cause of the injury he sustains, he cannot recover damages from another therefor. But, under certain exceptional conditions, * * * a plaintiff may be legally chargeable with the negligence of some third person, which is imputed to him as though it were his own. In this particular the law of negligence is analogous to the general principles of the law as to the liability under which one is primarily liable for his own acts, and only secondarily for the acts of others, as *e. g.* those of his servant or agent. The rule upon this branch of our subject. is that the contributory negligence of third persons constitutes a valid defense to the plaintiff's action only when that negligence is legally imputable to the plaintiff. There must, in order to create this imputability, be some connection which the law recognizes between the plaintiff and the third person from which the legal responsibility may arise. The negligence of the third person and *its legal imputa*-bility must occur. It is clear that there is no justification for the negligent misconduct of the defendant in that same third person, a stranger, was also in the wrong. When the defendant pleads the negligence of a party other than the plaintiff in bar of the action, it must appear, not only that such third person was in fault, but that the plaintiff ought to be charged with that fault."

It follows, then, that in cases where the injured and negli-

gent do not sustain to each other the relations of master and servant, or principal and agent, or other relation by which alone one is responsible for the act of the other, the contributory negligence of a third person will not be imputed to the party thereby affected unless he was at the time subject to the control of the injured person, and the wrong, the negligence, was committed at a time when it was within the power of such person to prevent it, and it was his duty to do so, and under circumstances which indicated that he assented to or acquiesced in the wrong by his failure to interfere, or directed it to be done; and that when the conditions are reversed, the reverse is true—it will be imputed.

The engineer of a railroad train is presumed to have been selected on account of his fitness for the position he fills. Being qualified, it is not the duty of the conductor to keep him under his constant supervision. In the discharge of his duties the engineer must be left to a large extent to the exercise of his own judgment. There was no evidence in this case tending to prove that engineer Adams was not, before the collision of his train at Ravenden, careful and competent for the discharge of his duties, or that McFall, his conductor, had reason to believe that he was not.

The jury, in returning a verdict in favor of the plaintiff, necessarily found that the negligence of Adams was not imputable to McFall, and that McFall was not guilty of contributory negligence. The evidence was sufficient to sustain their findings.

Judgment affirmed.